[No. B179978. Second Dist., Div. Four. Oct. 26, 2005.]

MICHAEL S. OVITZ et al., Plaintiffs and Appellants, v.
CATHERINE E. SCHULMAN, Defendant and Respondent.

832

---

---

## COUNSEL

Greenwald, Pauly, Foster & Miller, Jeffrey J. Lewis and Andrew S. Pauly for Plaintiffs and Appellants.

Nixon & Peabody and Walter T. Johnson for Defendant and Respondent.

OPINION

**WILLHITE, J.**—The issues in this appeal involve the interplay of three arcane and technical areas of law: the California disclosure obligations in contractual arbitration; the California statute governing the vacating of arbitration awards; and the limited preemptive effect of the Federal Arbitration Act on state arbitration law.

Responding to legislative mandate, the California Judicial Council promulgated the California Ethics Standards for Neutral Arbitrators in Contractual Arbitration. (23 pt. 4 West's Ann. Cal. Rules of Court (appen., div. VI) (2005 ed.), pp. 566–588; California Standards.) The standards require arbitrators to make comprehensive disclosures of potential grounds for disqualification. On a showing that the arbitrator failed timely to disclose a ground for disqualification of which he or she was aware, the California Code of Civil Procedure requires the vacating of any award rendered by the arbitrator. (Code Civ. Proc., § 1286.2, subd. (a)(6)(A) (section 1286.2(a)(6)(A).)[1]

By contrast, the Federal Arbitration Act employs a different standard: it permits the vacating of an arbitration award only on a showing of "evident partiality" by the arbitrator. (9 U.S.C. § 10(a)(2).) When the issue is the arbitrator's failure to disclose, the Ninth Circuit interprets "evident partiality" to mean that the undisclosed facts must create a "reasonable impression of partiality.' " (*Schmitz v. Zilveti* (9th Cir. 1994) 20 F.3d 1043, 1046; see also *Commonwealth Corp. v. Casualty Co.* (1968) 393 U.S. 145, 149 [21 L.Ed.2d 301, 89 S.Ct. 337].)

In this case, appellants Michael S. Ovitz, Artists Production Group, LLC, and five other business entities (we shall refer to all appellants collectively as the APG parties) prevailed in an arbitration proceeding against respondent Catherine E. Schulman.[2] The trial court, however, vacated the arbitration award under section 1286.2(a)(6)(A), finding that the arbitrator failed to comply with his disclosure obligation under standard 12(b) of the California Standards. The APG parties appeal from this ruling, as well as from the trial court's denial of their motion for reconsideration. They raise three alternative contentions: (1) the arbitrator complied with his disclosure obligation under standard 12(b); (2) assuming he did not, Schulman forfeited the right to vacate the arbitration award, and in any event the trial court should have reconsidered the forfeiture argument; and (3) assuming Schulman did not forfeit the right to vacate the arbitration award, the Federal Arbitration Act

---

[1] All further undesignated section references are to the Code of Civil Procedure. All further references to standards are to the California Standards.

[2] The five other entities are Artists Production Group, Inc.; the StudioCanal/APG Venture; APG StudioCanal LLC; StudioCanal (U.S.); and Studio Canal, S.A.

(9 U.S.C. §1 et seq.; FAA) preempts the California statute (§ 1286.2(a)(6)(A)) governing the vacating of an arbitration award for an arbitrator's failure to disclose.

To resolve these issues, we examine the relevant disclosure requirements of the California Standards (past and present), and conclude that the arbitrator did not comply with his disclosure obligations. We further conclude that Schulman did not forfeit the right to vacate the arbitration award, and that the trial court properly denied reconsideration of the APG parties' forfeiture claim. Finally, after reviewing the language of the relevant sections of the FAA, the congressional purpose of that legislation, and the parties' arbitration agreement, we hold that the FAA does not preempt section 1286.2(a)(6)(A).

## FACTUAL AND PROCEDURAL BACKGROUND

In June 2001, respondent Schulman entered an employment agreement with one of the APG parties, a joint venture called the StudioCanal/APG Venture. Formed to produce 12 to 15 feature films over three years, the joint venture hired Schulman as president. The employment agreement contained an arbitration clause, which required arbitration before the American Arbitration Association (the AAA) of "[a]ny controversy, claim or dispute arising out of or in any way relating to this agreement . . . [or Schulman's] employment by [the joint venture]." In February 2002, simmering disputes between Schulman and others involved in the StudioCanal/APG Venture led to Schulman's departure. Schulman claimed that she was terminated without cause; the joint venture claimed that she resigned. A subsequent settlement agreement between Schulman and the APG parties failed to resolve all disputes.

In September 2002, relying on the arbitration clause in Schulman's employment contract with the StudioCanal/APG Venture, the APG parties served a demand for arbitration on Schulman, and filed a demand with the AAA. Among other things, the demand sought arbitration of claims relating to the parties' rights and duties under Schulman's employment agreement, and sought affirmative relief for the APG parties. Schulman disputed whether the AAA had jurisdiction over her claims against the APG parties. In October 2002, she filed a civil lawsuit in Los Angeles Superior Court alleging these claims (*Schulman v. Ovitz* (Super. Ct. L.A. County, No. BC282846)). The APG parties then moved to compel arbitration. In December 2002, the trial court granted the motion in part, compelling arbitration of Schulman's claims against the StudioCanal/APG Venture, but not her claims against the other APG parties.

The APG parties appealed the trial court's ruling, but also moved forward with the arbitration. In a letter dated January 7, 2003, approved by Schulman's attorney, counsel for the APG parties informed the AAA that they and Schulman had agreed upon the appointment of Retired Justice Campbell Lucas (the Arbitrator) as their arbitrator. The letter stated that "the designation of [the Arbitrator] is also subject to all of the disclosure requirements imposed on [him] by the American Arbitration Association and the California Code of Civil Procedure."

On January 14, 2003, the AAA faxed to counsel for Schulman and the APG parties a cover letter stating in part: "In accordance with the California Arbitration Law (C.C.P. Section 1281.9), the fully executed Arbitrator Disclosure form is enclosed for your review." The cover letter noted that the "response date" was January 29, 2003, and that "[a]bsent our receipt of a proper notice of disqualification within the time specified, the appointment of the proposed Arbitrator will be confirmed." Accompanying the letter was a form, completed by the Arbitrator, entitled "Arbitrator Disclosure Worksheet." In the body of our opinion, we will discuss the relevant contents of this form.

By the date specified in the AAA's cover letter, neither Schulman nor the APG parties filed a notice of disqualification, and the AAA confirmed the Arbitrator's appointment. In April 2003 (the precise date is unclear from the record), the APG parties and Schulman entered an agreement to submit all of their claims against each other to arbitration in the pending arbitration proceeding. The claims to be arbitrated included not simply the claims alleged in Schulman's complaint and in the APG parties' arbitration demand, but all claims of any type. In relevant part, the agreement stated: "Such arbitration shall be final and binding, and judicial review shall be limited as provided by California Code of Civil Procedure § 1286.2 or other applicable law. The arbitrator shall apply, as applicable, federal or California substantive law and law of remedies. The arbitration shall be conducted in accordance with the AAA National Rules for the Resolution of Employment Disputes in effect at the time the Arbitration was initiated."

The arbitration proceeding began on September 8, 2003. On 23 days through February 26, 2004, the Arbitrator took evidence and heard argument. Twenty-one witnesses testified in person, 17 by declaration. The parties introduced several hundred exhibits. On February 26, 2004, following closing arguments, the Arbitrator orally ruled in favor of the APG parties on certain of their claims, and awarded them approximately $1.5 million in damages. He found against Schulman on all of her claims. On May 12, 2004,

the Arbitrator ruled that the APG parties were entitled to $1,878,739.15 in attorney fees and costs. The Arbitrator directed the APG parties to draft a written award reflecting his findings.

On May 27, 2004, after the APG parties had circulated a proposed draft of the award, the AAA faxed a letter to the attorneys for the APG parties and Schulman directing their attention to an enclosed "disclosure" from the Arbitrator. The disclosure was in the form of a letter dated May 26, 2004, from the Arbitrator to the AAA, regarding the Schulman arbitration, and a second arbitration entitled *California National Bank v. Kathleen Farnham and Farnham Security*. The Arbitrator wrote: "Pursuant to my telephone conversation with [two AAA representatives] this afternoon concerning the above cases, I am writing to you to clarify the disclosures made. In the APG v. Cathy Schulman case, I made a complete disclosure. In the California National Bank [case], I made a complete disclosure. In the APG case, the Claimant [APG parties] is represented by the Greenwald, Pauly firm, attorneys Andrew S. Pauly and Jeffrey J. Lewis [appearing]. In the California National Bank case, the Claimant is represented by the Greenwald, Pauly firm [the same firm representing the APG parties in the Schulman arbitration, but with], attorney Joshua D. Wayser [appearing]. [¶] Since I had made a complete disclosure in the California National Bank [case], including the fact that I was already in arbitration with the Greenwald, Pauly firm in the APG v. Cathy Schulman case, I believed that the [AAA] case manager in the California National Bank case would send my disclosure to the case manager in the APG v. Cathy Schulman case to see if there were any objections to my accepting the California National Bank case. I received no objections in either case. I was appointed arbitrator in the California National Bank case and conducted a preliminary hearing on March 1, 2004. On May 19, 2004, the California National Bank case manager informed the parties that the case had been suspended since the deposits had not been paid pursuant to AAA rules. [¶] . . . In the event there is any problem, I would be willing to recuse myself from the California National Bank case without payment of any fee to me."

The disclosure letter states that the Arbitrator "was appointed . . . and conducted a preliminary hearing" in the California National Bank case on March 1, 2004. Because it is highly unlikely that the Arbitrator was appointed the same date he conducted the first hearing, the precise date of the appointment is not clear from the disclosure letter. The only other evidence on the subject that appears in the record is contained in declarations submitted by the APG parties in support of their motion for reconsideration.

These declarations suggest that the Arbitrator and the attorneys for the law firm representing the APG parties had discussions in the California National Bank case as early as January or February 2004. We will summarize these declarations in our discussion of the trial court's denial of reconsideration, below.

The cover letter from the AAA that accompanied the disclosure directed the parties in the Schulman arbitration to lodge any objections to the Arbitrator's continued service within 15 days. If any objection were raised, the AAA would decide the issue in accordance with AAA rules. On June 3 and 14, 2004, Schulman's counsel sent letters to the AAA requesting the Arbitrator's disqualification. Schulman contended, as here relevant, that the Arbitrator violated the California Standards and sections 1281.9 and 1281.91, because he failed to disclose that he would entertain offers of employment from the law firm representing the APG parties, and failed to disclose his employment by that firm in the California National Bank arbitration. On June 15, 2004, the AAA denied Schulman's disqualification request, and reaffirmed the Arbitrator's appointment. The AAA also denied a request for reconsideration.

On July 15, 2004, after Schulman had submitted her objections to the initial draft award and the APG parties had submitted a revision, the AAA served the parties with the Arbitrator's final written award. Consistent with his oral rulings, the Arbitrator awarded the APG parties approximately $1.5 million in damages and $1,878,739.15 in attorney fees and costs, and found against Schulman on all of her claims against the APG parties.

The APG parties filed a petition to confirm the arbitration award in superior court. Schulman filed a response and a cross-petition to vacate the award.[3] As she had in her disqualification requests filed with the AAA, Schulman contended that the Arbitrator had violated his disclosure obligations. After full briefing and argument, the trial court issued a thoughtful, detailed written ruling in which it denied the APG parties' petition to confirm the award, and granted Schulman's cross-petition to vacate the award. The APG parties moved for reconsideration. The court denied reconsideration, and alternatively ruled that even if reconsideration were granted, the court would affirm its prior ruling vacating the arbitration award.

---

[3] Schulman also filed a motion to vacate the arbitration award. However, because the motion was filed without a proof of service, and because the issues were fully briefed in the filings related to the APG parties' petition to confirm the award, the trial court disregarded Schulman's motion to vacate.

## DISCUSSION

### I. The Arbitrator Failed to Comply Timely with the Relevant Disclosure Obligations of California Standards 12 and 7

The APG parties contend that the Arbitrator's Disclosure Worksheet sent by the AAA on January 14, 2003, fully complied with the Arbitrator's disclosure obligations under the California Standards. The argument, however, rests on a flawed understanding of the relevant standards, and an unlikely interpretation of the Disclosure Worksheet. As we explain, the Worksheet did not contain the disclosure required by standard 12(b) of the California Standards. Further, without that disclosure, the Arbitrator's acceptance of employment in the California National Bank case violated a separate provision of the standards (std. 12(c)). Also, the Arbitrator's failure to disclose that employment within 10 calendar days violated two additional provisions (stds. 7(c) and 7(d)(4)(A)(i)). We begin by summarizing the relevant provisions of the governing statutes and California Standards—provisions that are, to say the least, intricate.

### A. *The Requirements of the California Standards*

Seeking to provide " 'minimum ethical standards and remedies for the arbitrator's failure to comply with existing disclosure requirements' " (*Jevne v. Superior Court* (2005) 35 Cal.4th 935, 940 [28 Cal.Rptr.3d 685, 111 P.3d 954]), in 2001 the California Legislature enacted revisions to the statutory duties of disclosure imposed on arbitrators in contractual arbitration. (See *Azteca Construction, Inc. v. ADR Consulting, Inc.* (2004) 121 Cal.App.4th 1156, 1162–1163 [18 Cal.Rptr.3d 142] (*Azteca*).) As part of this revamping, the Legislature directed the California Judicial Council to "adopt ethical standards for all neutral arbitrators" effective July 1, 2002. (§ 1281.85, subd. (a).) Further, the Legislature amended section 1281.9, subdivision (a) to provide that "[i]n any arbitration pursuant to an arbitration agreement, when a person is to serve as a neutral arbitrator, the proposed neutral arbitrator shall disclose all matters that could cause a person aware of the facts to reasonably entertain a doubt that the proposed neutral arbitrator would be able to be impartial . . . ." Among the statutory list of required disclosures in section 1281.9 is "[a]ny matters required to be disclosed by the ethics standards for neutral arbitrators adopted by the Judicial Council pursuant to this chapter." (§ 1281.9, subd. (a)(2).) Section 1281.9, subdivision (b) provides the statutory time period and method for the arbitrator's initial disclosure: "the proposed neutral arbitrator shall disclose all matters required to be disclosed pursuant to this section to all parties in writing within 10 calendar days of service of notice of the proposed nomination or appointment." (See also std.7(c).)

The Judicial Council responded to the Legislature's mandate by adopting the California Standards effective July 1, 2002, later revised effective January 1, 2003. The standards "establish the minimum standards of conduct for neutral arbitrators" in contractual arbitration, and "are intended to guide the conduct of arbitrators, to inform and protect participants in arbitration, and to promote public confidence in the arbitration process." (Std. 1(a).) They contain detailed disclosure requirements (see stds. 7, 8, & 12), which supplement and expand the statutory listing of required disclosures contained in section 1281.9, subdivision (a). (§ 1281.85, subd. (a); std. 7(a); see also Com., 23 pt. 4 West's Ann. Cal. Rules of Court, *supra*, foll. std. 7, p. 577.)

One concern the standards address is the "bias, or appearance of bias, that may flow from one side in an arbitration being a source or potential source of additional employment, and thus additional income, for the arbitrator." (Rep. to Judicial Council from General Counsel Michael Bergeisen (Dec. 3, 2002) Ethics Standards for Neutral Arbitrators in Contractual Arbitration (amending Cal. Rules of Court, div. VI of appen.) p. 61 (Bergeisen Report).) The standards initially dealt with this subject in former standard 10. The January 2003 revisions amended former standard 10 and renumbered it standard 12.

Standard 12 prohibits the arbitrator from entertaining or accepting an offer of employment "as a lawyer, an expert witness, or a consultant" from a party or lawyer in the pending arbitration. (Std. 12(a).)[4] However, it permits the arbitrator to entertain offers from the parties or their lawyers to serve in other capacities, if the arbitrator discloses that intent. Further, it grants the parties the right to disqualify the arbitrator based on such a disclosure. Thus, standard 12(b) provides: "In addition to the disclosures required by standards 7 and 8, within ten calendar days of service of notice of the proposed nomination or appointment, a proposed arbitrator must disclose to all parties in writing if, while that arbitration is pending, he or she will entertain offers of employment or new professional relationships in any capacity other than as a lawyer, expert witness, or consultant from a party or a lawyer for a party, including offers to serve as a dispute resolution neutral in another case.[5] A party may disqualify the arbitrator based on this disclosure by serving notice of disqualification in the manner and within the time specified in Code of

---

[4] Standard 12(a) provides: "From the time of appointment until the conclusion of the arbitration, an arbitrator must not entertain or accept any offers of employment or new professional relationships as a lawyer, an expert witness, or a consultant from a party or a lawyer for a party in the pending arbitration."

[5] The term "lawyer for a party" includes "any lawyer or law firm currently associated in the practice of law with the lawyer hired to represent a party in the arbitration." (Std. 2(m).)

Civil Procedure section 1281.91(b)." Further, under subdivision (c) of standard 12, the arbitrator's failure to make the disclosure required by standard 12(b) precludes the arbitrator from entertaining or accepting any offer of employment from the parties or their lawyers "from the time of appointment until the conclusion of the arbitration."[6]

The disclosure language of standard 12(b) reflects a modification of its predecessor, former standard 10(b). The former standard required the arbitrator to disclose *"whether or not* he or she will entertain offers of employment" from the parties or their lawyers. (Cal. Rules of Court (West 2002) div.VI, p. 603, italics added.) Current standard 12(b) requires disclosure only "if" the arbitrator will entertain such offers. The Judicial Council staff proposed the change to clarify that "arbitrators [must] make a disclosure only if they will entertain offers of employment while the arbitration is pending[] [and that] no disclosure would be required if the arbitrator would not entertain such offers." (Bergeisen Rep., *supra,* at p. 61; see also *id.* at pp. 100–101.)

The primary disclosure provision of the California Standards is standard 7, which contains disclosure requirements applicable in all cases. As here relevant, it requires the arbitrator to disclose whether "[t]he arbitrator is serving . . . [a]s a neutral arbitrator in another prior *or pending* noncollective bargaining case involving a party to the current arbitration or a lawyer for a party." (Std. 7(d)(4)(A)(i), italics added.) As with all the topics covered by standard 7, this duty of disclosure is a continuing one. (Std. 7(f); see std. 9(a).) Further, "[i]f an arbitrator subsequently becomes aware of a matter that must be disclosed under either subdivision (d) or (e) of . . . standard [7], the arbitrator must disclose that matter to the parties in writing within 10 calendar days after the arbitrator becomes aware of the matter." (Std. 7(c).)

The continuing duty to disclose service in another pending case involving the parties or their lawyers (std. 7(d)(4)(A)(i)) is obviated if the arbitrator has made the disclosure of his intent to entertain such offers as required by standard 12(b). Thus, standard 7(b)(2) provides: "If an arbitrator has disclosed to the parties in an arbitration that he or she will entertain offers of employment or of professional relationships from a party or lawyer for a party while the arbitration is pending as required by subdivision (b) of

---

[6] Standard 12(c) provides: "If an arbitrator fails to make the disclosure required by subdivision (b) of this standard, from the time of appointment until the conclusion of the arbitration the arbitrator must not entertain or accept any such offers of employment or new professional relationships, including offers to serve as a dispute resolution neutral."

standard 12, the arbitrator is not required to disclose to the parties in that arbitration any such offer from a party or lawyer for a party that he or she subsequently receives or accepts while that arbitration is pending."

As pertinent to this case, the obligations imposed by these provisions may be summarized as follows: (1) if, while the current arbitration is pending, the arbitrator intends to entertain other offers of employment from the parties or their lawyers, the arbitrator must disclose that intention in writing within 10 calendar days of service of notice of the arbitrator's proposed nomination or appointment (std. 12(b)); (2) assuming this disclosure is made (and the arbitrator is not disqualified by a party), the arbitrator may accept such offers without the need for any further disclosure (std. 7(b)(2)); (3) assuming, however, that the arbitrator does *not* disclose an intent to entertain additional offers from the parties or their lawyers, the arbitrator *cannot* accept any such offer until the current arbitration is concluded (std. 12(c)); and (4) if, despite this prohibition, the arbitrator accepts such an offer, the arbitrator must disclose that fact to the parties in the current arbitration in writing (std. 7(d)(4)(A)(i)) within 10 calendar days (std. 7(c)).

B. *The Contents of the Arbitrator's Disclosure Worksheet*

As we have noted, on January 14, 2003, the AAA provided the parties to the Schulman arbitration with a copy of an Arbitrator Disclosure Worksheet filled out by the arbitrator. Intended to serve as the disclosure statement required by section 1281.9, subdivision (b), the wording of the form was directed to the Arbitrator, not the parties. It began: "California Code of Civil Procedure § 1281.9 (which incorporates CCP § 170.1 and the Ethics Standards for Neutral Arbitrators adopted by the California Judicial Council) and CCP § 1281.95 requires certain disclosures by a person nominated or appointed as an arbitrator. While the Association makes this worksheet available to neutrals appointed to cases administered by the Association, the ultimate obligation for compliance lies with the neutral. Accordingly, please review the relevant statutory provisions and the enclosed material before completing this worksheet."

In a section entitled "Disclosures Common to All Arbitrators," the worksheet asked the Arbitrator to check a box for "Yes" or "No" in response to questions related to various disclosures required by the standards. In completing the form sent to the APG parties and Schulman, the Arbitrator checked "Yes" in response to only one question: "Are you serving or, within the

preceding five years, have you served as a neutral arbitrator in another arbitration involving a party to the current arbitration or a lawyer for a party?" In a section entitled "General Provisions Applicable to Disclosure Obligations," the worksheet gave instructions on certain disclosure obligations. One paragraph stated: "**Offers of employment or professional relationship**. You are not required to disclose an offer of employment or professional relationship from a party or lawyer in the arbitration or a lawyer or law firm that is currently associated in the private practice of law with a lawyer in the arbitration if you have informed the parties about the offer and have sought their consent as required by subdivision (d) of standard 10 of the Ethics Standards for Neutral Arbitrators." (Boldface in original.) The reference to former standard 10(d) was outdated. The revised standards (including std. 12(b)) had taken effect on January 1, 2003, 13 days before the AAA served the Worksheet on the parties in the Schulman arbitration.

The final portion of the worksheet stated: "Please explain any 'yes' answer to any above question and/or make any additional disclosures you believe are appropriate." Explaining his sole "Yes" response, the Arbitrator wrote that his records showed he had served as a neutral in two arbitrations involving the law firm representing the APG parties, and one involving the law firm representing Schulman. He attached printouts with further details of the specific arbitrations.

C. *The Arbitrator's Disclosure Worksheet Did Not Comply with Standard 12(b)*

Missing from the Arbitrator's Disclosure Worksheet, summarized above, was any disclosure under standard 12(b)—that is, a declaration "if, while that arbitration is pending, [the arbitrator] will entertain offers of employment or new professional relationships . . . from a party or a lawyer for a party." The document did contain the following instruction *to the arbitrator*: "You are not required to disclose an offer of employment or professional relationship from a party or lawyer in the arbitration or a lawyer or law firm that is currently associated in the private practice of law with a lawyer in the arbitration if you have informed the parties about the offer and have sought their consent as required by subdivision (d) of standard 10 of the Ethics Standards for Neutral Arbitrators."

The APG parties argue that the mere inclusion of this sentence adequately disclosed the Arbitrator's intent to accept future offers of employment from the parties or their lawyers while the Schulman arbitration was pending. As best we understand the logic, it is this: the sentence told the Arbitrator that he did not have to disclose offers from the parties or their lawyers if he complied

with the consent procedure of former standard 10(d);[7] former standard 10(d) applied only to "consumer arbitrations" as defined in the California Standards; Schulman's arbitration was *not* a consumer arbitration; therefore, by negative implication, Schulman should have understood that the Arbitrator *would* entertain offers of employment while *her* arbitration was pending.

This logic is less a disclosure than a riddle. It relies on leaps of intuition rather than a commonsense understanding of the language used. As a means to communicate a simple thought—the Arbitrator's intent to accept offers of employment from the parties or their lawyers while Schulman's arbitration was pending—it collapses under its own weight.

Moreover, the California Standards "are to be construed and applied to further the[ir] purpose and intent . . . and in conformance with all applicable law." (Std. 1(c).) The purpose and intent of the standards is "to guide the conduct of arbitrators, to inform and protect participants in arbitration, and to promote public confidence in the arbitration process." (Std. 1(a); see also std. 1(b).) The Judicial Council staff recommended the elimination of former standard 10(d) on the rationale that the deletion "will diminish protections for consumers somewhat, but staff believes that consumers' ability under . . . [standard 12(b)] to disqualify any arbitrator who has a policy of taking new employment from a party or attorney while the arbitration is pending carries sufficient protection." (Bergeisen Rep., *supra,* at p. 62.) These objectives contemplate a disclosure under standard 12(b) that reasonably conveys the arbitrator's intent to entertain offers of employment from the parties or their lawyers. They do not contemplate the opaque, circuitous "disclosure" described by the APG parties. (See *International Alliance of Theatrical Stage Employees, etc. v. Laughon* (2004) 118 Cal.App.4th 1380, 1390 [14 Cal.Rptr.3d 341] (*International Alliance*) [party to arbitration "was entitled to the functional equivalent of the disclosure mandated by statute, i.e., an explicit, formal proffer of the disqualifying information (§ 1281.9) and an opportunity to object (§ 1281.91)"].)

---

[7] Former standard 10, as noted earlier, was the predecessor of current standard 12. Under former standard 10(d), if the arbitrator disclosed that he or she would entertain offers of employment from the parties or their lawyers, he was thereafter permitted to "entertain" them, but in "consumer arbitrations" forbidden to "accept" them "without the informed consent of all parties to the current arbitration." (Cal. Rules of Court, *supra,* div. VI, p. 603.) Former standard 10(d) established a procedure for obtaining such consent in consumer arbitrations: the arbitrator was required to disclose the offer to the parties in writing within five days of receipt (former std. 10(d)(1)); the parties had seven days thereafter to object (former std. 10(d)(1) & (d)(2)); if no party objected within that time frame, the arbitrator could accept the offer (former std. 10(d)(2)); and, having thus obtained consent, the arbitrator was not required to make a further disclosure of the offer under standard 7 (former std. 10(d)(3)). (*Ibid.*)

D. *The Arbitrator Did Not Comply with Standards 12(c), 7(c), and 7(d)(4)(A)(i)*

Having failed to comply with standard 12(b), the Arbitrator was precluded from serving as an arbitrator in any other matter involving the parties or any lawyer for the parties until the Schulman arbitration was completed. (Std. 12(c).) However, apparently unaware of this prohibition, the Arbitrator accepted appointment in the California National Bank case. The precise date of the Arbitrator's appointment in the California National Bank case is not clear. The disclosure letter dated May 26, 2004, states that the Arbitrator "was appointed . . . in the California National Bank case and conducted a preliminary hearing on March 1, 2004." It is likely the Arbitrator entertained the offer to serve in the California National Bank case and was appointed *earlier* than March 1, 2004, though the appellate record gives us no firm date. Regardless, when appointed the Arbitrator knew that attorneys from the same law firm represented both California National Bank in its arbitration and the APG parties in the Schulman arbitration. Further, as of his appointment in the California National Bank Case, the Schulman arbitration was still pending. The first hearing in the California National Bank case was held March 1, 2004. By that date, the Arbitrator had finished the evidentiary proceedings in the Schulman case and announced his oral rulings on the parties' causes of action. But he had not yet ruled on the APG parties' request for attorney fees or served his final arbitration award.

Besides being prohibited by standard 12(c), the Arbitrator's service in the California National Bank arbitration was a matter covered by the disclosure requirement of standard 7(d)(4)(A)(i)—service "[a]s a neutral arbitrator in another . . . pending noncollective bargaining case [for] a lawyer for a party [to the current arbitration]." Under standard 7(c), the arbitrator was required to make that disclosure, in writing, within 10 calendar days of his appointment in the California National Bank case. However, the Arbitrator did not make any written disclosure until May 27, 2004, when the AAA faxed to the parties a copy of the Arbitrator's disclosure letter dated May 26, 2004, nearly three months after the date of the first hearing in the California National Bank case. By the date of the disclosure, the Arbitrator had orally ruled the APG parties were entitled to attorney fees, and had directed the APG parties to draft a proposed arbitration award.

## II. Section 1286.2 Requires the Vacating of the Arbitration Award

■ Under California law, an arbitrator's failure to comply timely with his or her disclosure obligations risks a severe consequence: the vacating of any arbitration award rendered by the arbitrator. Section 1286.2(a)(6)(A) provides

in relevant part that on a properly served and filed petition or response seeking to vacate an arbitration award (see § 1286.4), "the court *shall* vacate the award if the court determines any of the following: [¶] . . . [¶] (6) An arbitrator making the award . . . (A) failed to disclose within the time required for disclosure a ground for disqualification of which the arbitrator was then aware." (Italics added.) On its face, the statute leaves no room for discretion. If a statutory ground for vacating the award exists, the trial court must vacate the award. (See *Azteca, supra,* 121 Cal.App.4th at p. 1169; *International Alliance, supra,* 118 Cal.App.4th at pp. 1386–1387.)

In the instant case, the Arbitrator failed in his initial disclosure statement to timely disclose a ground for disqualification under standard 12(b), i.e., a disclosure "if" he would entertain other offers of employment from the parties or their lawyers. He then violated standard 12(c) by accepting appointment in the California National Bank case, knowing of the involvement of the law firm representing the APG parties in the Schulman arbitration. He also violated standards 7(d)(4)(A)(i) and 7(c) by failing to disclose his service in that case within 10 calendar days of his appointment. The APG parties do not dispute that at the time of the initial disclosure, the Arbitrator in fact intended to entertain offers from the parties or their lawyers. Thus, they concede that the arbitrator was "then aware" (§ 1286.2(a)(6)(A)) of this ground for disqualification. Indeed, we cannot conceive of a real-life situation in which an arbitrator would *not* be aware of his own intent to entertain such offers (although, from a practical standpoint, the failure to make such a disclosure would be insignificant absent the entertaining or acceptance of an offer). Hence, within the time required for disclosure, the Arbitrator failed to disclose two grounds of which he was aware that would otherwise justify disqualification—his intent to entertain offers of employment from the parties' attorneys (std. 12(b)), and his subsequent acceptance of such employment (std. 7(d)(4)(A)(i) and 7(c)). These failures require that the arbitration award be vacated. (§ 1286.2(a)(6)(A).)

### III. Schulman Did Not Forfeit the Right to Vacate the Arbitration Award

The APG parties contend that Schulman did not timely seek to disqualify the Arbitrator on the basis of his initial disclosure, and therefore forfeited her right to vacate the award based on any disclosure violation. The plain meaning of section 1281.91, which provides the statutory time frame for seeking disqualification of an arbitrator, defeats this contention.

As here relevant, in non-collective-bargaining cases, within 10 calendar days of service of notice of the proposed nomination or appointment, the arbitrator must make a written disclosure of all matters listed in standards

7(d) and (e) of which he or she is then aware, as well as the disclosure required by standard 12(b) if he or she intends to accept other employment from the parties or their lawyers. (Std. 7(c); § 1281.9, subd. (b).) Under section 1281.91, subdivision (a), if the "proposed neutral arbitrator" fails to make this initial written disclosure, a party may have him or her disqualified by serving a notice of disqualification "within 15 calendar days after the proposed nominee or appointee fails to comply with Section 1281.9." (See also std. 10(a)(1).) Similarly, if the "proposed neutral arbitrator" complies with the initial disclosure obligation, section 1281.91, subdivision (b) provides that he or she "shall be disqualified on the basis of the disclosure statement after any party entitled to receive the disclosure serves a notice of disqualification within 15 calendar days after service of the disclosure statement." (See also std. 10(a)(2).)

■ Section 1281.91, subdivision (c) contains a limited provision under which a party is deemed to have waived the right to disqualify the arbitrator if the party fails to act within the 15-day time period provided in section 1281.91, subdivisions (a) or (b). Thus, section 1281.91, subdivision (c) provides in part: "The right of a party to disqualify a proposed neutral arbitrator pursuant to this section shall be waived if the party fails to serve the notice pursuant to the times set forth in this section [referring to the 15-calendar-day period of subds. (a) and (b)], *unless the proposed nominee or appointee makes a material omission or material misrepresentation in his or her disclosure.*" (Italics added.)

■ In the instant case, the Arbitrator's initial disclosure statement contained a material omission: it failed to disclose under standard 12(b) that he intended to entertain other offers of employment from the parties or their attorneys. Even if not initially material, it certainly became material when, in violation of standard 12(c), the Arbitrator accepted appointment in the California National Bank case, and failed timely to disclose it under standards 7(d)(4)(A)(i) and 7(c). Thus, although Schulman did not challenge the Arbitrator within 15 calendar days after the Arbitrator's initial disclosure, she did not waive her right to challenge him. The waiver rule of section 1281.91, subdivision (c) "manifestly applies only when the proposed arbitrator has made the requisite disclosure." (*International Alliance, supra,* 118 Cal.App.4th at p. 1392.)

## IV. The Trial Court Properly Denied Reconsideration

The APG parties contend that the trial court erred in denying their motion for reconsideration of the order vacating the arbitration award. In making the motion in the trial court, the APG parties cited a then-recent decision by the Ninth Circuit, and argued that "new facts" existed. The recent decision was

*Fidelity Federal Bank v. Durga Ma Corp.* (9th Cir. 2004) 386 F.3d 1306 (*Fidelity*). "[A]s a matter of first impression" for the Ninth Circuit, *Fidelity* held that "a party with constructive knowledge of potential partiality of an arbitrator waives its right to challenge an arbitration award based on evident partiality if it fails to object to the arbitrator's appointment or his failure to make disclosures until after an award is issued." (*Id.* at p. 1313.)

The APG parties' purported "new facts" were contained in declarations filed by Andrew Pauly, one of the attorneys who represented the APG parties in the Schulman arbitration, and James Ellis and Bryce Johnson, who were in-house attorneys for the APG parties. According to these declarations, on a date in late January or early February 2004, before the Arbitrator announced his oral rulings, the declarants and one of Schulman's attorneys, Edward Kubec, were present during a break in the proceedings when the Arbitrator made a telephone call to the AAA case administrator for the California National Bank case. The Arbitrator left a message asking the case administrator to set up a conference call involving the Arbitrator and the attorneys in the California National Bank case, including Joshua Wayser of Pauly's law firm. After the call, Kubec made a comment indicating knowledge that Pauly's firm was involved in the California National Bank case. James Ellis recalled the comment to be: "What is this, are you guys trying to buy up all of his time?"

In moving for reconsideration, the APG parties argued, in substance, that California law conflicts with federal law as reflected in the Ninth Circuit's *Fidelity* decision; that federal law preempts California law; and that under the "constructive knowledge" standard of *Fidelity*, Schulman had waived her right to seek an order vacating the award.

Schulman opposed the motion for reconsideration on procedural and substantive grounds. The opposition included a declaration from Kubec in which he denied knowledge of any telephone call the Arbitrator may have made concerning the California National Bank arbitration. He stated that he only learned of the Arbitrator's involvement in that arbitration upon receipt of the letter from the AAA dated May 27, 2004, which enclosed the Arbitrator's disclosure letter.

■ The trial court denied reconsideration, finding that the APG parties failed to present new law or new facts. In the alternative, the trial court reaffirmed its prior ruling vacating the arbitration award. Both rulings are sound. To obtain reconsideration under section 1008, subdivision (a), a party must show "new or different facts, circumstances, or law," and must present a "satisfactory explanation" for failing to provide the new evidence or law earlier. (*Baldwin v. Home Savings of America* (1997) 59 Cal.App.4th 1192,

1200 [69 Cal.Rptr.2d 592].) The standard of review of the trial court's ruling is abuse of discretion. (*Glade v. Glade* (1995) 38 Cal.App.4th 1441, 1457 [45 Cal.Rptr.2d 695].)

The APG parties failed to meet their burden to justify reconsideration. The *Fidelity* decision was not "new law." The Ninth Circuit relied on earlier decisions from other circuits that "invoked the waiver principle under circumstances in which a complaining party either knew or should have known of the facts indicating partiality of an arbitrator but failed to raise an objection prior to the arbitration decision." (*Fidelity, supra,* 386 F.3d at p. 1313, citing as examples *JCI Communications v. International Broth.* (1st Cir. 2003) 324 F.3d 42, 52, and *Kiernan v. Piper Jaffray Cos., Inc.* (8th Cir. 1998) 137 F.3d 588, 593.) Thus, the APG parties could have relied on these decisions to raise the issue earlier. Decisions by the Ninth Circuit have no greater persuasive force on California courts than those of other circuits. (*Forsyth v. Jones* (1997) 57 Cal.App.4th 776, 783 [67 Cal.Rptr.2d 357] (*Forsyth*).) Also, the APG parties' evidence—Attorney Kubec's alleged overhearing of the Arbitrator's telephone call, and Kubec's purported comment concerning Pauly's firm's "buying" the Arbitrator's time—was not "new." The APG parties certainly knew of it at the time the arbitration award was vacated.

Thus, the APG parties failed to satisfy the requirements of section 1008, subdivision (a), and the trial court did not abuse its discretion in denying reconsideration. In the alternative, the trial court reaffirmed its vacating of the arbitration award. In part, the trial court "decline[d] to credit the recent recollection of [the purportedly new] evidence" presented by the APG parties. This credibility finding was supported by substantial evidence (the declaration of attorney Kubec), and will not be second-guessed on appeal. (*Griffith Co. v. San Diego Col. for Women* (1955) 45 Cal.2d 501, 508 [289 P.2d 476] (*Griffith Co.*); *Enyart v. City of Los Angeles* (1999) 76 Cal.App.4th 499, 508, fn. 3 [90 Cal.Rptr.2d 502].) Therefore, even if the APG parties' evidentiary showing might have supported application of the *Fidelity* waiver rule (an issue we do not reach), the trial court's rejection of the evidence precludes an appellate finding of waiver.[8]

## V. The Federal Arbitration Act Does Not Preempt Section 1286.2(a)(6)(A)

The APG parties contend that even if the Arbitrator failed in his disclosure obligations, the failure does not require the vacating of the arbitration award.

---

[8] Because on these grounds we uphold the trial court's rulings, we do not reach Schulman's appellate claim, not raised in the trial court, that the order vacating the arbitration award was a final judgment, and could not be the subject of a motion for reconsideration.

The reason: the FAA preempts California law governing the vacating of an arbitration award. We conclude, however, that a review of the relevant statutory language, the congressional purpose of the FAA, and the parties' arbitration agreement demonstrates that the FAA does not preempt section 1286.2(a)(6)(A).

"In 1925, Congress passed the FAA to 'overrule the judiciary's longstanding refusal to enforce agreements to arbitrate' and to place such agreements ' "upon the same footing as other contracts, where it belongs." ' " (*Cronus Investments, Inc. v. Concierge Services* (2005) 35 Cal.4th 376, 383 [25 Cal.Rptr.3d 540, 107 P.3d 217] (*Cronus*).) The FAA applies to arbitrations held under arbitration clauses in written contracts "evidencing a transaction involving commerce." (9 U.S.C. § 2.) In the instant case, the parties agree that the FAA applies to the Schulman arbitration.

Section 10(a)(2) of the FAA provides in relevant part: "In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—[¶] . . . [¶] (2) Where there was *evident partiality* or corruption in the arbitrators, or either of them." (Italics added.) The APG parties contend that section 10(a)(2) of the FAA preempts application of section 1286.2(a)(6)(A) in two ways. First, according to the APG parties, the "evident partiality" standard of section 10(a)(2) of the FAA permits the vacating of an arbitration award for inadequate disclosure only if the undisclosed facts create a "reasonable impression of partiality." (*Schmitz v. Zilveti, supra,* 20 F.3d at p. 1046; see also *Commonwealth Corp. v. Casualty Co., supra,* 393 U.S. at p. 149.) The APG parties assert that this standard preempts section 1286.2(a)(6)(A), which mandates the vacating of an arbitration award for *any* violation of California disclosure obligations, regardless of whether the undisclosed facts create a reasonable impression of partiality. Second, when a party has constructive knowledge of a ground for disqualification but remains silent, the APG parties argue that the waiver rule of *Fidelity, supra,* 386 F.3d at page 1313, preempts section 1286.2(a)(6)(A).

We quickly dispose of the second purported area of preemption—the Ninth Circuit's holding in *Fidelity.* It is not clear whether the *Fidelity* waiver rule has its roots in section 10(a)(2) of the FAA, or whether it is a judicially created procedural principle independent of the statute. Of course, if the rule is judicially created without a basis in the statute, it likely cannot be a predicate for federal preemption through the FAA. (See *Siegel v. Prudential Ins. Co.* (1998) 67 Cal.App.4th 1270, 1290–1291 [79 Cal.Rptr.2d 726] (*Siegel*).) Moreover, as the *Fidelity* opinion notes, "[s]everal federal courts hold that a party's failure to object to the real or evident partiality of an arbitrator before an award is issued does not waive the challenge *unless the*

*party had real, actual knowledge of the conflict."* (*Fidelity, supra,* 386 F.3d at p. 1313, italics added.) Thus, even if the *Fidelity* rule of waiver based on constructive knowledge derives from section 10(a)(2) of the FAA, the rule is not a universally accepted principle. As we have noted, decisions of the Ninth Circuit are no more persuasive in California than decisions of other circuits. (*Forsyth, supra,* 57 Cal.App.4th at p. 783.) More importantly, in the instant case, the only evidence that would arguably support application of *Fidelity* was presented in the declarations filed in support of the APG parties' motion for reconsideration. The trial court, however, declined to credit those declarations, and we will not set that determination aside. (*Griffith Co., supra,* 45 Cal.2d at p. 508.) Thus, deciding whether *Fidelity* preempts California law is of no consequence to this appeal. (See *Palermo v. Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 65–66 [195 P.2d 1]; *Young v. Three For One Oil Royalties* (1934) 1 Cal.2d 639, 647–648 [36 P.2d 1065].) Finally, even if the *Fidelity* waiver rule is a proper predicate for preemption deriving from section 10(a)(2) of the FAA, and even if it were material to this appeal, it could have no greater preemptive effect than section 10(a)(2) itself. For all these reasons, we decline to discuss *Fidelity* further. We will rest our decision on consideration of the preemptive effect of section 10(a)(2) alone.

A. *The Relevant Statutory Language of the FAA Applies to Federal District Courts*

Our discussion of the first ground of preemption asserted by the APG parties—preemption by the evident partiality standard of section 10(a)(2) of the FAA—requires some preliminary qualification. There is considerable debate among the federal circuits concerning the proper test of evident partiality under section 10(a)(2). (*Montez v. Prudential Securities, Inc.* (8th Cir. 2001) 260 F.3d 980, 983; see generally, Comment, *What an Arbitrator Should Investigate and Disclose: Proposing a New Test for Evident Partiality Under the Federal Arbitration Act* (2003) 53 Case W. Res. L.Rev. 815, 826–827, 834, and cases therein cited.) The United States Supreme Court has considered the subject only once, in *Commonwealth Corp. v. Casualty Co., supra,* 393 U.S. 145, a decision open to interpretation. (See *ANR Coal Co., Inc. v. Cogentrix of North Carolina* (4th Cir. 1999) 173 F.3d 493, 498–499, fn. 3; *Olson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (8th Cir. 1995) 51 F.3d 157, 159.) Understanding the uncertainty, we will assume that the Ninth Circuit's "reasonable impression of partiality" test is the correct definition. (See *Britz, Inc. v. Alfa-Laval Food & Dairy Co.* (1995) 34 Cal.App.4th 1085, 1102–1103 [40 Cal.Rptr.2d 700].) That assumption in place, the answer to whether section 10(a)(2) of the FAA preempts California law lies in the relevant statutory language of the FAA, the purpose of that legislation, and the parties' arbitration agreement.

In cases to which it applies, the FAA has a "limited preemptive effect" on state law. (*Hedges v. Carrigan* (2004) 117 Cal.App.4th 578, 584 [11 Cal.Rptr.3d 787].) " 'The FAA contains no express pre-emptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration. [Citation.] But even when Congress has not completely displaced state regulation in an area, state law may nonetheless be pre-empted to the extent that it actually conflicts with federal law—that is, to the extent that it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." [Citation.]' " (*Cronus, supra,* 35 Cal.4th at p. 385, quoting *Volt Info. Sciences v. Leland Stanford Jr. U.* (1989) 489 U.S. 468, 477 [103 L. Ed.2d 488, 109 S.Ct. 1248] (*Volt*).)

One guide to congressional intent is the plain meaning of the federal statutory language. (*Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 407–408 [58 Cal.Rptr.2d 875, 926 P.2d 1061] (*Rosenthal*).) The language of the relevant sections of the FAA—sections 10 and 12— strongly suggest that they apply only in federal court proceedings. Section 10(a) states the statutory grounds under the FAA for vacating an arbitration award upon application of a party. It expressly refers to orders to vacate made by "the United States court in and for the district wherein the award was made." Similarly, subdivision (b) of section 10, which governs the vacating of an award issued under title 5 United States Code section 580, provides that "[t]he United States district court for the district wherein an award was made" may vacate the award.[9] Section 12 of the FAA provides the procedure for presenting a motion to vacate. In relevant part, it refers to service of the motion on "a resident of the district within which the award was made," and service on a nonresident "by the marshal of any district within which the adverse party may be found."[10] This language strongly suggests that sections

---

[9] Title 5 United States Code section 580 is part of the Administrative Dispute Resolution Act of 1996 (5 U.S.C. § 571 et seq.), which gives federal agencies broad authority to enter arbitration agreements. Section 10(b) applies to arbitrations held under such agreements, and provides: "The United States district court for the district wherein an award was made that was issued pursuant to section 580 of title 5 may make an order vacating the award upon the application of a person, other than a party to the arbitration, who is adversely affected or aggrieved by the award, if the use of arbitration or the award is clearly inconsistent with the factors set forth in section 572 of title 5."

[10] Section 12 of the FAA provides in full: "Notice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered. If the adverse party is a resident of the district within which the award was made, such service shall be made upon the adverse party or his attorney as prescribed by law for service of notice of motion in an action in the same court. If the adverse party shall be a nonresident then the notice of the application shall be served by the marshal of any district within which the adverse party may be found in like manner as other process of the court. For the purposes of the motion any judge who might make an order to stay the proceedings in an action brought in the same court may make an order, to be served with the notice of motion, staying the proceedings of the adverse party to enforce the award."

10 and 12 apply only to federal district courts, not state trial courts. (*Siegel, supra,* 67 Cal.App.4th at pp. 1281–1282 ["statutory language [of sections 10 and 12] weighs materially against the application . . . to a forum other than the United States District Court of the district in which the award was made"]; see *Cronus, supra,* 35 Cal.4th at p. 388 [phrases "court of the United States" in section 3, and "United States district court" in section 4, indicate that those sections apply only in federal court].) Thus, the wording of the relevant sections of the FAA evidences a congressional intent not to preempt state law.

## B. *Section 1286.2(a)(6)(A) Is Not Inconsistent with the Purpose of the FAA*

■ As the California Supreme Court has recognized, absent an express preemption provision, federal statutory language does not resolve the question of preemption. (*Rosenthal, supra,* 14 Cal.4th at p. 408.) Courts must also consider the broader objectives of the federal legislation.

Both the California and United States Supreme Courts have held that Congress intended the FAA to ensure that arbitration agreements are enforced according to their own terms, thereby encouraging the use of private arbitration as a means of resolving disputes. The California Supreme Court recently summarized the decisions discussing the FAA's purpose. " 'Section 2 [of the FAA] is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary. The effect of the section is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act.' [Citation.] Thus, the FAA 'establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.' [Citation.] The policy of enforceability established by section 2 of the FAA is binding on state courts as well as federal courts. [Citation.] [¶] However, the FAA's purpose is not to provide special status for arbitration agreements, but only 'to make arbitration agreements as enforceable as other contracts, but not more so.' [Citation.] In accord with this purpose, the high court has stated that state contract rules generally govern the construction of arbitration agreements. [Citations.] '[T]he federal policy is simply to ensure the enforceability, according to their terms, of private agreements to arbitrate.' [Citation.]" (*Cronus, supra,* 35 Cal.4th at p. 384; see *Siegel, supra,* 67 Cal.App.4th at pp. 1286–1289 [reviewing United States Supreme Court precedent and legislative history].) Further, "[n]othing in the legislative reports and debates [concerning the FAA] evidences a congressional intention that postaward and state court litigation rules be preempted so long as the basic policy upholding the

enforceability of arbitration agreements remained in full force and effect." (*Siegel, supra,* 67 Cal.App.4th at p. 1289.)

By its terms, section 1286.2(a)(6)(A) does not undermine the enforceability of arbitration agreements. It neither limits the rights of contracting parties to submit disputes to arbitration, nor discourages persons from using arbitration. Section 1286.2(a)(6)(A) merely requires the vacating of an award if the arbitrator failed timely to disclose a ground for disqualification of which he was aware. Indeed, because it applies to vacating an arbitration award, section 1286.2(a)(6)(A) presupposes that the arbitration agreement has been enforced and the arbitration held. If an award is vacated, the result is not a preclusion of further arbitration, but rather a new arbitration held in accordance with the disclosure requirements.

Further, the legislative purpose of section 1286.2(a)(6)(A), like the California disclosure requirements as a whole, does not reflect hostility to arbitration or an attempt to limit the ability to enter arbitration agreements. The California scheme seeks to enhance both the appearance and reality of fairness in arbitration proceedings, thereby instilling public confidence. With increased public confidence, arbitration is more attractive as a means of resolving private disputes. Hence, far from posing an obstacle to implementing the purpose of the FAA, section 1286.2(a)(6)(A) actually *serves* that purpose.

The APG parties contend that section 1286.2(a)(6)(A) violates the purpose of the FAA because it "undermines the entire arbitration process, allowing a party to seize upon a technicality to vacate an arbitration award." In fashioning the disclosure requirements, however, the Judicial Council has made a reasoned effort to list matters that "could cause a person aware of the facts to reasonably entertain a doubt that the proposed neutral arbitrator would be able to be impartial." (§ 1281.9, subd. (a).) Indeed, the declared legislative purpose of section 1286.2(a)(6)(A) is to give statutory voice to "existing case law which provides that an arbitration award may be vacated when a neutral arbitrator fails to disclose a matter that might cause a reasonable person to question the ability of the arbitrator to conduct the arbitration proceeding impartially." (Stats. 2001, ch. 362, § 8.) Thus, when a court vacates an arbitration award under section 1286.2(a)(6)(A), the undisclosed matter is one that the Judicial Council (with authority from the Legislature) has deemed sufficient to undermine an objective perception of fairness.

In this case, the Arbitrator violated standard 12(b), a disclosure requirement designed to permit a party to disqualify an arbitrator if he or she has a policy of accepting other employment from the parties or their attorneys while the

present arbitration is pending. He then accepted such employment (a violation of std. 12(c)), and failed timely to disclose that acceptance (a violation of stds. 7(c) and 7(d)(4)(A)(i)). We do not mean to suggest that there is any indication that the Arbitrator was in fact unfair. Indeed, we find nothing in the record to support such an assertion. Furthermore, we recognize that the then-recent revisions of the standards likely caused some confusion in the arbitration community. Nonetheless, vacating the arbitration award under section 1286.2(a)(6)(A) does not reflect a mindless adherence to mere "technicalities." It does reflect, however, a considered policy judgment of the Legislature and Judicial Council—one that does not violate the letter or spirit of the FAA.

C. *Application of Section 1286.2(a)(6)(A) Is Not Inconsistent with the Parties' Arbitration Agreement*

"There is no federal policy favoring arbitration under a certain set of procedural rules; the federal policy is simply to ensure the enforceability, according to their terms, of private agreements to arbitrate." (*Volt, supra,* 489 U.S. at p. 476.) In the instant case, the vacating of the arbitration award is not inconsistent with the parties' objectively expressed intent in their correspondence and arbitration agreement. (See *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 956 [135 Cal.Rptr.2d 505] [objective intent of contracting parties controls contract interpretation].)

The trial court compelled arbitration of Schulman's claims against the StudioCanal/APG Venture, but not her claims against the other APG parties. In a letter dated January 7, 2003, Schulman and the APG parties informed the AAA that they accepted the Arbitrator's appointment "subject to all of the disclosure requirements imposed on [the Arbitrator] by the American Arbitration Association *and the California Code of Civil Procedure.*" (Italics added.) The AAA responded by forwarding to the parties a copy of the Arbitrator Disclosure Worksheet. The worksheet had been completed by the Arbitrator, and purported to comply with sections 1281.9 and 1281.95, as well as the California Standards. Thus, from the outset of the arbitration proceeding, the parties contemplated that the California disclosure requirements applied, in addition to AAA disclosure requirements.

In April 2003, the parties agreed to use the same arbitrator and same arbitration to resolve all their claims. Nothing in this record indicates that the parties changed their previously expressed expectation that the California disclosure requirements applied. Indeed, in the trial court, the APG parties

vigorously opposed the vacating of the arbitration award. Yet, in their written opposition to Schulman's motion to vacate the arbitration award (see fn. 4, *ante*), they conceded that "all parties agree" the Arbitrator was obligated to make the disclosure required by standard 12(b).

The April 2003 arbitration agreement provided in relevant part: "Such arbitration shall be final and binding, *and judicial review shall be limited as provided by California Code of Civil Procedure § 1286.2 or other applicable law*." (Italics added.) Of course, section 1286.2 prescribes the grounds on which an arbitration award shall be vacated, including the grounds of subdivision (a)(6)(A). Given the parties' expectation that California disclosure rules applied, they necessarily understood that the arbitration award could be vacated under section 1286.2(a)(6)(A) for a violation of the disclosure requirements.

The APG parties note that the April 2003 agreement also stated that the arbitration would be "conducted in accordance with the AAA National Rules for the Resolution of Employment Disputes in effect at the time the Arbitration was initiated." Because the AAA rules contain provisions governing disqualification of arbitrators, the APG parties contend that vacating the arbitration award under section 1286.2(a)(6)(A) for a violation of the California Standards would be inconsistent with the parties' contract. The relevant extrinsic evidence, however, does not support the contention. As we have discussed, that evidence shows that the parties contemplated that both AAA *and* California disclosure rules would apply. Further, the agreement provided that judicial review of the arbitration award would occur under section 1286.2 or other applicable law. To the extent there is any conflict on the subject of judicial review between this specific term and the more general provision that the arbitration would be governed by AAA rules, the specific provision controls. (*Prouty v. Gores Technology Group* (2004) 121 Cal.App.4th 1225, 1235 [18 Cal.Rptr.3d 178]; see § 1859; Civ. Code, § 3534.)

■ Finally, as the APG parties further observe, the arbitration agreement referred to possible review under "other applicable law." Perhaps, as the APG parties suggest, "other applicable law" meant the FAA. Yet, the agreement left open the question of whether there *is* "other applicable law." To the extent the parties meant the FAA, we have now resolved the question: the FAA does not preempt section 1286.2(a)(6)(A). Thus, vacating the arbitration award under section 1286.2(a)(6)(A) does not violate the parties' contract. Based on this conclusion, combined with our review of the relevant federal statutory language and the purpose of the FAA, we hold that the section 10(a)(2) of the FAA does not preempt section 1286.2(a)(6)(A).

## DISPOSITION

The orders vacating the arbitration award and denying reconsideration are affirmed.

Hastings, Acting P. J., and Curry, J., concurred.